UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MICHAEL ABREU,<br><br>    Plaintiff<br><br>v.<br><br>NORTH AMERICAN PARTNERS IN ANESTHESIA,<br><br>    Defendant | Civil Action No. |

## COMPLAINT

NOW COMES the Plaintiff, MICHAEL ABREU (hereinafter, the "Plaintiff"), through his undersigned counsel of record, and files this Complaint for Damages against Defendant, NORTH AMERICAN PARTNERS IN ANESTHESIA, (hereinafter, referred to as "Defendant" or "NAPA") on the following grounds:

1. This action is brought by Plaintiff for damages against Defendant for discrimination on the basis of race and sex, hostile work environment, and retaliation for Plaintiff's prior protected activity in violation of: (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the Virginia Human Rights Act ("VHRA"), Code of Virginia §2.2-3900, *et seq.*

## JURISDICTION AND VENUE

2. This Court has original jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331 because those claims arise under the United States Constitution and laws of the United States.

3. Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the VHRA because those state law claims arise out of the same nucleus of operative fact as the Title VII claims.

4. This Court has jurisdiction over Defendant because, upon information and belief, it is a citizen of the United States, has sufficient minimum contacts in Virginia, or otherwise intentionally availed itself of the Virginia market so as to render the exercise of jurisdiction over it by the Federal and Virginia courts consistent with traditional notions of fair play and substantial justice.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events, acts, and/or omissions giving rise to Plaintiff's claims occurred in the Commonwealth of Virginia. Specifically, Plaintiff was employed by Defendant at a location in this judicial district; Plaintiff's employment records are located and maintained by NAPA in this judicial district; and the unlawful employment practices and decisions adverse to Plaintiff's employment which are the basis of this civil action took place in this judicial district.

6. The EEOC issued Plaintiff a Right to Sue Letter on or about February 25, 2021. Mr. Abreu has satisfied all administrative prerequisites to bringing this action.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events, acts, and/or omissions giving rise to Plaintiff's claims occurred in the State of Virginia. Specifically, they occurred in Falls Church, Virginia.

## **PARTIES**

8. Michael Abreu is a citizen of the United States who currently resides in North Carolina. Plaintiff submits himself to the jurisdiction of the United States District Court for the Eastern District of Virginia for any and all purposes related to or arising from the action within.

9. At all times relevant to the facts alleged in this lawsuit, Plaintiff was employed by Defendant.

10. Defendant, NAPA, conducts business operations from its Virginia office located at 3998 Fair Ridge Dr Ste 300. Fairfax, Virginia 22033.

11. During all times relevant to this action, Defendant met the jurisdictional prerequisites for a claim under Title VII.

12. Defendant, including its supervising personnel, officials, agents, officers, and employees were responsible for all acts complained of herein.

## ADMINISTRATIVE PROCESS

13. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 21, 2021.

14. After more than 180 days, the EEOC issued Plaintiff a Notice of Right to Sue on April 7, 2022. *See* Exhibit A.

15. Plaintiff's suit is timely filed with this Court.

## STATEMENT OF FACTS

16. Mr. Abreu was employed with North American Partners in Anesthesia[1] ("NAPA") for nearly three years as a Certified Registered Nurse Anesthetist (CRNA). Due to demand, he frequently worked seventy-two hours or more per week.

17. Mr. Abreu's Fiancé, Taylor Englade (CRNA), was also employed by NAPA and worked in the same hospital.

18. On the weekends, Mr. Abreu and Ms. Englade frequently work with a part-time CRNA, Lisa Shaw.

---

[1] Mr. Abreu was hired by MEDNAX, Inc. in 2018. MEDNAX, Inc. was acquired by North American Partners in Anesthesia on or around May 6, 2020.

3

19. Due to the number of hours spent working together, many of the CRNAs have developed a close friendship and kept exchanges going after work hours through group text messages. Mr. Abreu, Ms. Englade, and Ms. Shaw, along with several other CRNAs, participated in these communications. They all had a good relationship and joked and teased each other regularly. Ms. Shaw never expressed any discomfort with the nature of these interactions and in fact equally participated with her sexual jokes and innuendos.

20. On January 1, 2021, Mr. Abreu wrote an email to the corporate medical director and CRNA group regarding salary expectations within the anesthesia group, suggesting they were vastly underpaid, inquiring about their previously promised overtime bonuses, and requesting solutions moving forward. The following day, Ms. Shaw told Mr. Abreu that the email contained good information; she was also very critical of Dr. Gambardella, Chairperson Department Of Anesthesiology and spoke very ill of her in an ongoing fashion.

21. Around two hours later, Mr. Abreu ate lunch alongside Ms. Shaw and Dr. Gambardella during their break in the lunchroom. Later that day, Mr. Abreu teased Ms. Shaw, suggesting she had "something brown on her nose." Ms. Shaw chased Mr. Abreu approximately ten feet down the hall saying, "Michael, I wish I was, but I can't be like you and Taylor. You guys are more vocal than I am. But I have a house and two kids here, I have to be a lot more political than the two of you are and play the game differently here."

22. On or around January 3, 2021, Mr. Abreu and Ms. Englade entered the anesthesia lounge and Ms. Shaw repeatedly screamed out and said, "you know what? I thought about you a lot last night. You're a fucking harasser. You're a fucking bully." Mr. Abreu was shocked by her comments. He said that he was sorry she felt this way and offered to talk things out with her. Ms. Shaw replied, "get the fuck away from me. I never want to fucking see you again." Ms. Shaw

then ran directly past Taylor Englade and out of the anesthesia lounge where the three of them were. During this conversation, Mr. Abreu behaved in a calm and appropriate manner, while Ms. Shaw raised her voice and created a scene.

23. The following week, concerned about receiving a reprimand for her behavior, Ms. Shaw submitted a written complaint to Dr. Gambardella, filled with untruthful allegations against Mr. Abreu. Ms. Shaw falsely claimed that Mr. Abreu has a history of harassing and bullying her and that he has a history of sexual harassment in the way that he speaks to others, which makes her uncomfortable.

24. On January 19, 2021, Mr. Abreu met with Dr. Gambardella and Tricia Jordan, Chief CRNA, to discuss the allegations. In this meeting Mr. Abreu explained that the abundance of allegations followed an alarming and violent behavior in which Mrs. Shaw displayed a complete loss of control in her actions and emotions. He explained that timeline of her complaint did not make sense either. That she had waited a full eight days until the following week and work shift in where she realized how coworkers alongside Mr. Abreu and Ms. Englade began to distance themselves from Mrs. Shaw's behavior. It was not until this event that Mrs. Shaw became concerned about her conduct and decided to set in motion the first blow of fabricated claims in order to control the narrative. Mr. Abreu followed through with great detail of the events that led to the outbreak and even explained to Dr. Gambradella about his "Brown nose" comment. Both Dr. Gambradella and Ms. Jordan shared a laugh to this confession and found nothing wrong with the joke. Both Dr. Gambardella and Ms. Jordan conveyed their beliefs in Mr. Abreu and both admitted to Mrs. Shaw's behavior through the workplace to be very unorthodox, strange, and unstable at times. They explained that if this matter was kept in-house that it would

be in easy fix since they both know the credibility and integrity of each employee. However, Ms. Shaw pushed the matter up to the corporate level.

25. After her complaint, Ms. Shaw's attitude towards Mr. Abreu changed. She became very cocky and smug towards Mr. Abreu and Ms. Englade. Clearly, she was not afraid of Mr. Abreu as a "harasser."

26. Due to Ms. Shaw's outburst and false complaint, Mr. Abreu was uncomfortable working with her. Ms. Englade, on Mr. Abreu's behalf, sent a complaint on January 24, 2021 to Ms. Jordan and other NAPA officials explaining that Ms. Shaw's claims of harassment were unsubstantiated and Mr. Abreu did not feel safe working with her.

27. Mr. Abreu had several group texts wherein Ms. Shaw had even invited them to her home, she sent a personal family Christmas card to Mr. Abreu and Ms. Englade's residence. With a text a message that read, "Merry Christmas," and one with a picture of her kid's gingerbread house. Ms. Shaw's text messages show that she was not harassed by Mr. Abreu in the weeks preceding her complaint. More importantly, the letter alleged that Mr. Abreu did not feel safe working with Ms. Shaw after her aggressive outburst earlier that month.

28. On January 27, 2021, Mr. Abreu attended meeting with Andrea Lindor (Employee Relations Manager) and Maria Gonzalez (Employee Relations Manager new hire) via Zoom. They discussed some text messages that were sent in the CRNA group chat. Mr. Abreu provided context for the messages. Specifically, they were making friendly jokes at Brandy, at another CRNA's expense. It is important to note that these texts were sent after work hours. Furthermore, Brandy "laughed" at Mr. Abreu's text messages and responded "Lmao" [laugh my ass off] to a GIF that he sent. It should be noted that Ms. Englade (Mr. Abreu's fiancé) was included in this group message.

29. On or around January 28, 2021, CRNA Brandy notified Mr. Abreu that Ms. Shaw asked her if he [Mr. Abreu] made her feel uncomfortable. Mr. Abreu apologized if he had ever disrespected her or made her feel uncomfortable. Brandy started laughing and said, "are you serious? I wish you would have sexually harassed me" indicating that he had never made her feel that way.

30. On or around February 10, 2021, Ms. Lindor interviewed Ms. Englade regarding Ms. Shaw's claims. Ms. Englade informed Ms. Lindor that Ms. Shaw frequently discussed her sex life with her [Ms. Englade]. Ms. Lindor responded by saying that that is a normal conversation for work friends to have.

31. Ms. Shaw spoke to Mr. Abreu and Ms. Englade repeatedly and on several occasions about her relationship with her husband, including how they had to lie when they worked in the military together because they were fraternizing and he was her superior; how they first kissed in the back of a humvee vehicle; their sex life would often be affected because her husband snored at night and that it led them to sleep in separate bedrooms. She frequently discussed her family personal life with work colleagues.

32. On February 11, 2021, Mr. Abreu emailed Ms. Lindor and Ms. Gonzalez regarding the investigation. He notified them that since their meeting, numerous rumors and indifferences amongst fellow staff members had come to light and Ms. Shaw was attempting to coerce fellow coworkers to follow through with a narrative that fits the false pretense to the fabricated and spiteful claims for which she has made.

33. Coworker Lindsey Mica admitted to Mrs. Shaw pulling her aside, attempting to facilitate a story that could coincide with her plans. She asked Ms. Mica if Michael had ever made her feel inappropriate and that she should write an email to Ms. Jordan about anything she

7

could think of to bring him down. She informed to Ms. Mica of what she was doing with her complaint and that she hoped to add her [Ms. Mica] on.

34.     Another CRNA, Sheila Veibert approached both Mr. Abreu and Ms. Englade separately to say that she had heard about what has been going on and that she wanted each of them to know that she is "neutral" in this issue and that she is not on Lisa Shaw's side. Both Michael and Taylor responded similarly and in different situations by saying thank you but that they are not at liberty to discuss the ongoing investigation. Ms. Shaw broke protocol with both Ms. Mica and Ms. Veibert and actively worked to manipulate the investigation even though Ms. Lindor warned both parties not to do so and that doing so could potentially lead to termination.

35.     Mr. Abreu told Ms. Lindor and Ms. Gonzalez that he felt targeted during their January 27, 2021 Zoom meeting, and that the conversation was biased and accusatory.

36.     On or around February 28, 2021, Mr. Abreu learned that coworker Lindsey Mica was interviewed by Ms. Lindor. Ms. Mica disclosed Ms. Lindor's intense drive to support a certain narrative rather than listen to what Ms. Mica had to say. This newly developed allegation was that Mr. Abreu approached Ms. Mica while she was eating a fruit and made a derogatory comment. Ms. Mica confirmed that nothing along those lines or of that level had ever occurred.

37.     NAPA engaged in an aggressive investigation into Ms. Shaw's claims, despite the fact that it should have been quickly obvious that there was no basis for the allegations. Ms. Lindor's investigation was done with predetermined outcome. She attempted to get witnesses to say negative things about Mr. Abreu. Furthermore, NAPA never investigated Mr. Abreu's complaint about working with Ms. Shaw. At no point were Mr. Abreu and Ms. Shaw ever separated pending an investigation and they continued to work weekend hours together even though Mr. Abreu repeatedly asked human resources to intervene in the manner.

38. Ms. Shaw herself engaged in numerous inappropriate interactions: she sent text messages to Mr. Abreu and fellow CRNA Ji regarding a rumor of rape involving the daughter of an upper management official. She said that transgender people irk her and that they remind her of silence of the lambs when the character wears the human skins of one of his victims and puts the lotion in the basket. Finally, Ms. Shaw frequently violated Health Insurance Portability and Accountability Act (HIPAA) privacy protections by looking up records of patients not directly within her care, so that she could intentionally avoid picking up new assignments and find alternative routes as to try and bring down Mr. Abreu by scrolling through the personal anesthesia record of his patients.

39. Ms. Shaw concocted a false narrative regarding Mr. Abreu when she was concerned that she might get in trouble for her outburst against him. She created a hostile work environment for Mr. Abreu and, when informed of the situation, NAPA did nothing to investigate Ms. Abreu's complaint or stop Ms. Shaw's behavior and abuse.

40. Ms. Shaw's sex-based discrimination has placed Mr. Abreu's employment and reputation in jeopardy and NAPA has done nothing to prevent her actions. Instead, NAPA began to actively refrain from taking any immediate action on Mrs. Shaw, even after the HIPPA allegations were substantiated.

41. On March 31, 2021, Mr. Abreu emailed NAPA and made inquiries about an update on the investigation. He repeated his concerns regarding the hostile atmosphere created by Ms. Shaw who continued to cause discord in the workplace. Ms. Lindor responded, attempting to cover her bases on the length and quality of the investigation.

42. Mr. Abreu replied, standing his ground and reciting the hostile environment that he was suffering while NAPA failed to separate either/both employees. More specifically, NAPA

9

never attempted to reach out to Mr. Abreu. Rather, they continued to allow this situation to drag on knowing that the complexity of Ms. Shaw's actions were coming to light and that their investigation on Mr. Abreu continued to lack evidence. NAPA also alleges that their investigation lasted "almost a month"; however, nearly three months passed and zero attempts were made to notify Mr. Abreu of such.

43. On April 06, 2021, INOVA rendered an EMR report on Ms. Shaw and found close to one hundred charts showing illegitimate access dating back from January 2021. INOVA Chief Compliance Officer immediately submitted proof to NAPA and began to endlessly reach out to administrators from NAPA with no response.

44. On April 17, 2021, Ms. Shaw continued to access charts and admitted to ascertaining knowledge on specific cases handled by other providers (details only known through direct chart access). On April 26, 2021, NAPA finally responded to INOVA's written communication after the legal team inquired on the situation and lack of response.

45. On May 18, 2021, NAPA emailed Mr. Abreu to conclude and discuss their biased investigation. NAPA denied Mr. Abreu's request for his legal counsel be present. Mr. Abreu also requested to exclude Ms. Lindor because she makes him uncomfortable, feel targeted, and he feared her desire to bring him down. This was the fourth time Mr. Abreu had notified Ms. Lindor of the targeted, biased investigation, hostility, and severe uncomfortableness. However, NAPA continued its attempt to bully Mr. Abreu into submission until finally Ms. Lindor was removed from the email correspondence and withheld from the Zoom meeting for conclusion.

46. On May 20, 2021, Mr. Abreu attended an extremely aggressive and overbearing Zoom conference with Christine Boateng and VP of HR Sheryl Blumberg. Ms. Blumberg's temper and aggression began to significantly increase throughout their brief meeting. Ms.

Blumberg took a break and informed Mr. Abreu that was concluding the meeting because she had better things to do than to waste her time on this any further.

47. Shocked and insulted, Mr. Abreu informed Ms. Blumberg and Ms. Boateng that he was logging off and would not continue to bear the hostility. Immediately after the meeting, Mr. Abreu followed up with an email to Ms. Blumberg, Ms. Boateng and the legal team to recount the harshness and unprofessionalism of the meeting. Neither Ms. Blumberg nor NAPA responded to his email, and made no attempt/remark to rebuke the claims of their behavior.

48. On May 17, 2021, NAPA issued a first and final warning; this disciplinary action was without cause.

49. Due to the nature of the investigation against him, the failure to investigate his claims, and the unjustified final warning, Mr. Abreu had no choice but to resign.

## COUNT ONE
## SEX DISCRIMINATION
## [Title VII, 42 U.S.C. § 2000e, *et seq.*]

50. Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

51. Title VII of the Civil Rights Act of 1964 states that it "shall be an unlawful employment practice for an employer— ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S. Code § 2000e–2(a)(1).

52. NAPA was and continues to be an "employer" within the meaning of Title VII.

53. Mr. Abreu was an "employee" within the meaning of Title VII.

54. Mr. Abreu is a male.

55. Both Ms. Shaw (female) and Mr. Abreu made complaints about a hostile work environment created by a co-worker. NAPA vigorously investigated Ms. Shaw's complaint, seeking out information that would implicate Mr. Abreu. NAPA ignored Mr. Abreu's complaint.

56. NAPA failed to separate Mr. Abreu from Ms. Shaw.

57. NAPA disciplined Mr. Abreu without cause, but, upon information and belief, took no action against Ms. Shaw.

58. Due to the nature of the investigation and the disciplinary action, Mr. Abreu, as any reasonable person in his position, had no choice but to resign.

59. By the acts and omissions alleged above, Defendants intentionally deprived Plaintiff of equal employment opportunities, and otherwise adversely affected his status as an employee, by constructively discharging him in violation of 42 U.S.C. § 2000e-2.

60. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, employment benefits, career path opportunities, and expenses, in an amount to be proved at trial.

61. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

62. As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

## COUNT TWO

## NATIONAL ORIGIN DISCRIMINATION
### [Title VII, 42 U.S.C. § 2000e, *et seq.*]

63. Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

64. Title VII of the Civil Rights Act of 1964 states that it "shall be an unlawful employment practice for an employer— ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S. Code § 2000e–2(a)(1).

65. NAPA was and continues to be an "employer" within the meaning of Title VII.

66. Mr. Abreu was an "employee" within the meaning of Title VII.

67. Mr. Abreu is Hispanic with Cuban heritage.

68. Both Ms. Shaw (white) and Mr. Abreu made complaints about a hostile work environment created by a co-worker. NAPA vigorously investigated Ms. Shaw's complaint, seeking out information that would implicate Mr. Abreu. NAPA ignored Mr. Abreu's complaint.

69. NAPA failed to separate Mr. Abreu from Ms. Shaw.

70. NAPA disciplined Mr. Abreu without cause, but, upon information and belief, took no action against Ms. Shaw.

71. Due to the nature of the investigation and the disciplinary action, Mr. Abreu, as any reasonable person in his position, had no choice but to resign.

72. By the acts and omissions alleged above, Defendants intentionally deprived Plaintiff of equal employment opportunities, and otherwise adversely affected his status as an employee, by constructively discharging him in violation of 42 U.S.C. § 2000e-2.

73. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, employment benefits, career path opportunities, and expenses, in an amount to be proved at trial.

74. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

75. As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

## COUNT THREE
## RETALIATION
## [Title VII, 42 U.S.C. § 2000e, et seq.]

76. Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

77. Title VII states that it is unlawful "for an employer to discriminate against any of his employees..., because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S. Code § 2000e–3.

78. In April 06, 2021, Mr. Abreu and the hospital's Chief Compliance Officer reported Lisa Shaw's harassment to NAPA's Human Resources Department, including Human Resource Director Sheryl Blumberg.

79. NAPA failed to investigate Mr. Abreu's allegations.

80. Shortly after Mr. Abreu reported Lisa's conduct, NAPA gave Mr. Abreu a first and final warning; this disciplinary action was without cause and in retaliation for reporting a hostile work environment.

81. NAPA did not take Mr. Abreu's complaints of sexual harassment seriously.

82. Mr. Abreu engaged in protected activity when he complained of sexual harassment to NAMES.

83. Because NAPA refused to listen to or investigate Mr. Abreu's complaints, Mr. Abreu was forced to resign and was constructively discharged.

84. Mr. Abreu's protected activity and his constructive discharge were causally connected and not wholly unrelated.

85. As an actual and proximate cause of NAPA's conduct, Mr. Abreu has suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages and benefits.

86. Mr. Abreu seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by NAPA. Mr. Abreu seeks backpay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

**COUNT FOUR**
**SEX DISCRIMINATION**
**[VA. CODE § 2.2-3900 VIRGINIA HUMAN RIGHTS ACT]**

87. Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

88. The VHRA states, "Conduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including

lactation, age, marital status, disability, or national origin is an unlawful discriminatory practice under this chapter." Va. Code §2.2-3902.

89. The VHRA defines an "employee" as "an individual employed by an employer." Va. Code §2.2-3905(A).

90. The VHRA further defines an "employer" as "a person employing (i) 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." Va. Code §2.2-3905(A).

91. At all relevant times, Plaintiff was an employee of Defendant, and Defendant was Plaintiff's employer, pursuant to the VHRA.

92. The VHRA makes it unlawful for an employer to "[f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin." Va. Code §2.2-3905(B)(1)(a).

93. Additionally, the VHRA makes it unlawful for an employer "to use race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions, age, military status, disability, or national origin as a motivating factor for any employment practice, even though other factors also motivate the practice." Va. Code §2.2-3905(B)(6).

94. Defendant's conduct alleged herein was an unlawful discriminatory practice on the basis of sex in violation of the VHRA and federal law.

16

95. As a result of the unlawful discrimination, Plaintiff suffered lost wages and compensation, plus interest running from the date of his separation.

96. Plaintiff is also entitled to an award of attorneys' fees in an amount authorized by the VHRA.

**COUNT FIVE**
**NATIONAL ORIGIN DISCRIMINATION**
**[VA. CODE § 2.2-3900 VIRGINIA HUMAN RIGHTS ACT]**

97. Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

98. The VHRA states, "Conduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, marital status, disability, or national origin is an unlawful discriminatory practice under this chapter." Va. Code §2.2-3902.

99. The VHRA defines an "employee" as "an individual employed by an employer." Va. Code §2.2-3905(A).

100. The VHRA further defines an "employer" as "a person employing (i) 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." Va. Code §2.2-3905(A).

101. At all relevant times, Plaintiff was an employee of Defendant, and Defendant was Plaintiff's employer, pursuant to the VHRA.

102. The VHRA makes it unlawful for an employer to "[f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's race,

color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin." Va. Code §2.2-3905(B)(1)(a).

103. Additionally, the VHRA makes it unlawful for an employer "to use race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions, age, military status, disability, or national origin as a motivating factor for any employment practice, even though other factors also motivate the practice." Va. Code §2.2-3905(B)(6).

104. Defendant's conduct alleged herein was an unlawful discriminatory practice on the basis of notational origin in violation of the VHRA and federal law.

105. As a result of the unlawful discrimination, Plaintiff suffered lost wages and compensation, plus interest running from the date of his separation.

106. Plaintiff is also entitled to an award of attorneys' fees in an amount authorized by the VHRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Michael Abreu, respectfully requests that this Honorable Court enter judgment in his favor on all Counts of his Complaint and against Defendant, NAPA, and that he be awarded the following relief:

(a) Entry of judgment in favor of Plaintiff on all Counts;

(b) Award of back pay for Plaintiff against Defendant;

(c) Award of compensatory damages for Plaintiff against Defendant;

(d) Award of punitive damages for Plaintiff against Defendant;

(e) Award of reasonable attorneys' fees and litigation costs and expenses for Plaintiff against Defendant;

(f) Award of pre and post judgment interest for Plaintiff;

(g) Any other relief that this Court deems equitable, appropriate, and just.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

                Respectfully Submitted,

                */s/ Francisco Mundaca*
                Francisco Mundaca (VSB #96073)
                The Spiggle Law Firm
                3601 Eisenhower Ave., Suite 425
                Alexandria, Virginia 22304
                Phone: (202) 449-8527
                Facsimile: (202) 517-9179
                Email: fmundaca@spigglelaw.com