IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MICHAEL ABREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:22-cv-759 (RDA/WEF) |
| | ) | |
| NORTH AMERICAN PARTNERS | ) | |
| IN ANESTHESIA, LLP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants North American Partners in Anesthesia,

LLP and North American Partners in Anesthesia (Virginia), LLC's ("Defendants") Motion to

Dismiss for Lack of Subject Matter Jurisdiction, Lack of Personal Jurisdiction, and Failure to State

a Claim ("Motion").  Dkt. 21.  This Court has dispensed with oral argument as it would not aid in

the decisional process.  Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  This matter has been fully

briefed and is now ripe for disposition.  Considering the Motion together with Defendants'

Memorandum in Support (Dkt. 22), Plaintiff Michael Abreu's ("Plaintiff") Opposition (Dkt. 25),

and Defendants' Reply (Dkt. 26), this Court GRANTS the Motion to Dismiss for the reasons that

follow.

## I.  BACKGROUND

### A.  Factual Background[1]

Plaintiff Michael Abreu alleges five counts of sex and national origin discrimination against North American Partners in Anesthesia, LLP ("NAPA LLP") and North American Partners in Anesthesia (Virginia), LLC ("NAPA VA") in violation of Title VII of the Civil Rights Act of 1964 and the Virginia Human Rights Act ("VHRA"): (1) discrimination and a hostile work environment based on sex under Title VII and the VHRA (Counts I and IV); (2) discrimination and a hostile work environment based on national origin under Title VII and the VHRA (Counts II and V); and (3) retaliation under Title VII (Count III).

Plaintiff Michael Abreu is a Hispanic male who alleges he was employed by NAPA LLP and NAPA VA for three years as a Certified Registered Nurse Anesthetist ("CRNA").  Dkt. Nos. 19 ¶ 9; 25 at 2.  Plaintiff is a resident of North Carolina.  Dkt. 19 ¶ 8.  NAPA LLP is a medical care and service company that is headquartered in New York, but Plaintiff alleges it also provides medical services in many states including Virginia.[2]  *Id.* ¶ 10.  Plaintiff was employed as a CRNA and frequently worked seventy-two hours or more per week.  *Id.* ¶ 18.  On the weekends, Plaintiff frequently worked with a part-time CRNA named Lisa Shaw.  *Id.* ¶ 20.  The CRNAs developed a "close friendship," and Plaintiff, Ms. Shaw, Ms. Englade (Plaintiff's fiancé), and others participated in a group text messaging thread after work.  They all had a "good relationship and joked and teased each other regularly."  *Id.* ¶ 21.  Ms. Shaw never expressed any discomfort with

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] Defendant NAPA LLP disputes that it has any connection to Virginia.  Dkt. 22 at 7.

the content of the communications and "equally participated with her sexual jokes and innuendos." *Id.*

On January 1, 2021, Plaintiff emailed the CRNA group and corporate medical director regarding salary expectations, suggesting the CRNAs were underpaid, inquiring about previously promised overtime bonuses, and asking for solutions. *Id.* ¶ 22. The next day, Ms. Shaw told Plaintiff that she agreed with the contents of the email and that she also was critical of Dr. Gambardella, Chairperson of the Department of Anesthesiology. *Id.* That day during their break in the lunchroom, Plaintiff, Ms. Shaw, and Dr. Gambardella ate lunch together. *Id.* ¶ 23. Afterward, Plaintiff teased Ms. Shaw saying she had "something brown on her nose." *Id.* Ms. Shaw then chased Plaintiff approximately ten feet down the hall and stated "Michael, I wish I was, but I can't be like you and Taylor. You guys are more vocal than I am. But I have a house and two kids here, I have to be a lot more political than the two of you are and play the game differently here." *Id*.

Around January 3, Plaintiff and Ms. Englade walked into the anesthesia lounge and Ms. Shaw screamed out saying "you know what? I thought about you a lot last night. You're a fucking harasser. You're a fucking bully." *Id.* ¶ 24. Plaintiff was shocked by her comments and apologized. When Plaintiff offered to talk things out with her, Ms. Shaw replied "get the fuck away from me. I never want to fucking see you again." *Id.* Ms. Shaw then left the room that Ms. Englade and Plaintiff were in. *Id.* Plaintiff remained calm throughout the situation, and Ms. Shaw raised her voice and "created a scene." *Id.* The next week, Ms. Shaw submitted a complaint to Dr. Gambardella with false allegations that Plaintiff "had a history of harassing her, bullying her, and that Plaintiff had a history of sexual harassment in the way he talks with others, which makes her uncomfortable." *Id.* ¶ 25.

On January 19, 2021, Plaintiff met with Dr. Gambardella and Tricia Jordan, Chief CRNA, regarding Ms. Shaw's allegations. *Id.* ¶ 26. Plaintiff indicated to Dr. Gambardella and Ms. Jordan that the allegations arose after an alarming incident with Ms. Shaw where she "displayed a complete loss of control in her actions and emotions." *Id.* Plaintiff also explained during the meeting that Ms. Shaw waited eight full days to submit the complaint and only submitted the complaint after she realized that her coworkers, including Plaintiff and Ms. Englade, distanced themselves from her behavior, so that she could control the narrative. *Id.* Additionally, Plaintiff discussed the outburst in great detail as well as his earlier "brown nose" comment. *Id.* Dr. Gambardella and Ms. Jordan shared a laugh at Plaintiff's explanation, said they saw nothing wrong with the joke, and agreed Ms. Shaw's behavior was "unstable at times." *Id.* Both assured him that, if the matter was kept in house, "it would be an easy fix" since they both know the integrity of each employee. *Id.* But Ms. Shaw continued to push her complaint and became smug with Plaintiff and Ms. Englade which made clear to Plaintiff that Ms. Shaw was not afraid of Plaintiff as a "harasser." *Id.* ¶¶ 26-27. Due to Ms. Shaw's behavior and false complaint, Plaintiff felt uncomfortable working with her. *Id.* ¶ 28. Ms. Englade thus filed a complaint against Ms. Shaw on Plaintiff's behalf with "NAPA" [3] officials on January 24, 2021. *Id.* The complaint explained that Ms. Shaw's claims "were unsubstantiated" and that Plaintiff did not feel comfortable around her after her aggressive outburst. *Id.* ¶¶ 28-29. The letter also included text messages where Ms. Shaw invited Plaintiff to her home and other pleasant exchanges that Plaintiff believed showed Ms. Shaw did not feel harassed by him in the weeks preceding her complaint. *Id.* ¶ 29.

---

[3] Plaintiff refers to Defendants NAPA LLP and NAPA VA jointly as "NAPA" throughout the Amended Complaint. *See e.g.*, Dkt. 19 ¶¶ 28, 39, 41-47, 49-50 ("NAPA engaged in an aggressive investigation into Ms. Shaw's claims . . . .").

On January 27, 2021, Plaintiff attended a Zoom meeting with the current Employee Relations Manager, Ms. Lindor, and the newly hired Employee Relations Manager, Maria Gonzalez, where he explained some of the messages in the CRNA group text message thread that included Ms. Shaw, Plaintiff and Ms. Englade among others. *Id.* ¶ 30. Specifically, some of the text messages showed "friendly jokes" at the expense of another CRNA, Brandy. *Id.* Plaintiff explained these messages were after work hours and that Ms. Shaw laughed at the messages and responded with "LMAO" to a GIF sent by Plaintiff. *Id.* The next day, Brandy told Plaintiff that Ms. Shaw asked her if Plaintiff made Brandy uncomfortable. *Id.* ¶ 31. Brandy started laughing and said "Are you serious? I wish you would have sexually harassed me," which Plaintiff claims indicated that he had never made Brandy uncomfortable. *Id.*

Ms. Lindor interviewed Ms. Englade on or around February 10, 2021 about Ms. Shaw's claims. *Id.* ¶ 32. Ms. Englade told Ms. Lindor that it was common for Ms. Shaw to discuss her sex life with Ms. Englade and that Ms. Shaw frequently discussed her personal life with colleagues. *Id.* ¶¶ 32-33. Ms. Lindor commented that it was normal for coworkers to discuss their personal lives. *Id.* ¶ 32. The following day Plaintiff emailed Ms. Lindor and Ms. Gonzalez about the investigation and notified them that Ms. Shaw was attempting to coerce other coworkers to support her false claims. *Id.* ¶ 34. Another coworker, Lindsay Mica, told Plaintiff that Ms. Shaw also tried to persuade her to support Ms. Shaw's claims against Plaintiff, and that Ms. Shaw stated that she "hoped to add Ms. Mica to the complaint," and urged Ms. Mica "to write an email to Ms. Jordan about anything she could think of that was negative [about Plaintiff]." *Id.* ¶ 35. Sheila Veibert, another CRNA, told Plaintiff that she was neutral on the issue and not on Ms. Shaw's side. *Id.* ¶ 36. Though Ms. Lindor warned the parties not to interfere with the investigation, Plaintiff alleges that Ms. Shaw did so anyway and that Ms. Shaw "actively worked to manipulate the investigation."

*Id.* Plaintiff told Ms. Lindor and Ms. Gonzalez he felt targeted by the investigation during a January 27, 2021 Zoom meeting. *Id.* ¶ 37.

On or around February 28, 2021, Plaintiff learned that his coworker, Ms. Mica, was interviewed by Ms. Lindor and claimed that Ms. Lindor was pushing her to accept a narrative that Plaintiff made a derogatory comment while Ms. Mica was eating fruit. *Id.* ¶ 38. Ms. Mica confirmed that "nothing along those lines or of that level had ever occurred." *Id.* Defendants then engaged in an "aggressive" investigation into Ms. Shaw's complaint even though, according to Plaintiff, it should have been obvious there was no basis for the allegations. *Id.* ¶ 39. Plaintiff claims that Ms. Lindor's investigation made clear that she already had a predetermined outcome, and that Ms. Lindor attempted to have witnesses say negative things about Plaintiff. *Id.* Plaintiff also alleges that Ms. Lindor ignored his complaints about working with Ms. Shaw and that Plaintiff and Ms. Shaw were never separated even though Plaintiff asked human resources to intervene. *Id.*

Plaintiff alleges Ms. Shaw engaged in inappropriate actions herself. Dkt. 25 at 7. In one specific instance, Ms. Shaw texted him and another CRNA about a rape rumor involving the daughter of an upper management official. Dkt. 19 ¶ 40. Plaintiff also claims Ms. Shaw made derogatory comments about transgender people. *Id.* ¶ 32. Finally, Plaintiff claims Ms. Shaw violated HIPPA privacy protections so that she could avoid new assignments and look for other ways to "bring down" Plaintiff. *Id.* According to Plaintiff, the HIPPA claims were eventually substantiated, but Defendants did not take any action against Ms. Shaw. Dkt. Nos. 25 at 8; 19 ¶ 45.

On March 31, 2023, Plaintiff emailed Defendants inquiring about the status of the investigation and repeated his concerns about working with Ms. Shaw who he claimed created a "hostile atmosphere." *Id.* Ms. Lindor responded regarding the length and quality of the

investigation, but Plaintiff continued to object that he was being subjected to a hostile environment. Dkt. 25 at 8. Plaintiff asserts that Defendants continued with their investigation into him despite discovering Ms. Shaw's inappropriate actions and finding no evidence that Plaintiff had done anything wrong. Dkt. 19 ¶ 44. Plaintiff claims that nearly three months passed during which he was not notified as to the status of the investigation. *Id.*

On May 18, 2021, Defendants emailed Plaintiff to schedule a meeting at which they could discuss their investigation with him and denied Plaintiff's request for legal counsel to be present with him. *Id.* ¶ 47. Plaintiff asked that Ms. Lindor also be excluded because she made him feel targeted and informed Ms. Lindor for the fourth time that he thought the investigation was biased and that it caused him severe discomfort. Dkt. 25 at 9. Defendants "continued [to] attempt to bully" Plaintiff until Ms. Lindor was removed from email correspondence and not included in the Zoom meeting. Dkt. 19 ¶ 47. Two days later, Plaintiff attended a Zoom call with Christine Boateng and VP of HR Sheryl Blumberg. *Id.* ¶ 48. Ms. Blumberg became increasingly aggressive throughout the meeting, and the meeting abruptly ended because Ms. Blumberg said she had better things to do. *Id.* Plaintiff was shocked and informed both parties that he would not "continue to bear the hostility." *Id.* ¶ 49. Following the meeting, Plaintiff sent an email describing its unprofessional nature to Ms. Blumberg, Ms. Boateng, and the legal team. *Id.* Plaintiff did not receive a response or apology. *Id.* On May 17, 2021, Defendants issued their first and final warning, which Plaintiff states was without cause. *Id.* ¶ 50. Following what Plaintiff perceived to be a biased investigation, the failure of Defendants to investigate his claims against Ms. Shaw, and the unjustified warning letter, Plaintiff resigned. *Id.* ¶ 51.

B.   Procedural Background

On July 21, 2021, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 16.  On April 11, 2022, the EEOC issued a Dismissal and Notice of Rights as to Plaintiff's Charge.  On July 8, 2022, Plaintiff filed his initial complaint with this Court.  Dkt. 1.  On September 19, 2023, Defendants filed a Motion to Dismiss, Dkt. 8, and Plaintiff filed his Opposition on October 3, 2022.  Also, on October 3, 2022, Plaintiff filed a Motion for Leave to Amend his Complaint, Dkt. 13, and Defendants filed their Reply on October 11, 2023.  Dkt. 17.  On October 25, 2022, the Court granted Plaintiff's Motion for Leave to Amend.  Dkt. 18.  Plaintiff filed his Amended Complaint on October 26, 2022, Dkt. 19, and on November 2, 2022 the Court denied Defendants' Motion to Dismiss as moot, Dkt. 20.   On November 9, 2022, Defendants filed a second Motion to Dismiss, Dkt. 21, and a Memorandum in Support, Dkt. 22.  Plaintiff filed his Opposition on November 23, 2022, Dkt. 25, and Defendants filed their Reply on November 29, 2022, Dkt. 26.

II.   STANDARD OF REVIEW

A. 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal when the court lacks jurisdiction over the subject matter of the action.  Fed. R. Civ. P. 12(b)(1).  A district court must dismiss an action over which it lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1), (h)(3).  The plaintiff, as the party asserting jurisdiction, bears the ultimate burden of proving such jurisdiction.  *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  If a defendant asserts that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based[,] . . . all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6)

8

consideration." *Id.* But in the event of a factual dispute over the jurisdictional allegations in the complaint, the court may consider evidence outside the complaint "without converting the proceeding to one for summary judgment." *Id.*

### B. 12(b)(2) Standard

Federal Rule of Civil Procedure 12(b)(2) provides that a court may dismiss a case for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). When resolving a Rule 12(b)(2) motion, a court undertakes a two-step analysis. First, a court looks to whether personal jurisdiction is authorized by state law. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004). Second, a court must find that the exercise of personal jurisdiction comports with the constitutional requirements of due process. *Id.* Virginia's long-arm statute extends personal jurisdiction to the constitutionally permissible limits of the Due Process Clause of the Fourteenth Amendment. *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 176 (4th Cir. 2002). Accordingly, "[b]ecause Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).

In making a personal jurisdiction determination, a district court "must accept as true the uncontroverted factual allegations in the plaintiff's complaint." *Mattiaccio v. Cantu Apiaries of Fla., LLC*, No. 1:21-cv-00421, 2022 WL 1597826, at *3 (E.D. Va. May 19, 2022) (quoting *Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 559 (5th Cir. 2013). When a court does not conduct an evidentiary hearing on personal jurisdiction, a case may be dismissed for lack of personal jurisdiction if the plaintiff has failed to make a *prima facie* showing. *See Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the

plaintiff." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (internal citation omitted). If such a showing is made, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction [so] unreasonable," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) as to "offend traditional notions of fair play and substantial justice," *Int'l Shoe*, 326 U.S. at 316. In evaluating the parties' requisite burdens, a court may rely on "motion papers, supporting legal memoranda, [] the allegations in the complaint," *Consulting Eng'rs*, 561 F.3d at 276, and "the contents of affidavits and any other relevant matter submitted by the parties to assist it in determining the jurisdictional facts," 5B Alan Wright & Arthur Miller, Fed. P. & Proc. § 1351, at 305 (3d ed. 2004); *In re Polyester Staple Antitrust Litig.*, No. MDL 3:3-CV-1516, 2008 WL 906331, at *7 (W.D.N.C. Apr. 1, 2008). *See also In re Polyester Staple Antitrust Litig.*, No. MDL 3:3-cv-1516, 2008 WL 906331, at *7 (W.D.N.C. Apr. 1, 2008) (explaining that, in determining whether a plaintiff has made a *prima facie* showing, "the court 'may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts'" (quoting *Reese Bros. v. U.S. Postal Serv.*, 477 F. Supp. 2d 31, 36-37 (D.D.C. 2007))).

## C. Rule 12(b)(6) Standard

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor.

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion.  *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## III.   ANALYSIS

Defendants move this Court to dismiss the instant action on three grounds: (1) lack of personal jurisdiction, (2) lack of subject matter jurisdiction because Defendant NAPA LLP was not named in the EEOC Charge, and (3) failure to state a claim.  Dkt. 22 at 1-2.  The Court will address each ground in turn.

### A.   Motion to Dismiss for Lack of Personal Jurisdiction for NAPA LLP

The Court first considers whether Plaintiff has made a *prima facie* showing of personal jurisdiction over NAPA LLP.[4]  There are two categories of personal jurisdiction: general and specific.  A court may exercise general jurisdiction over a non-resident defendant for non-forum related activities when that defendant's "continuous corporate operations" in the state are "so substantial" and so "'continuous and systemic' as to render [it] essentially at home in the forum state."  *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (quoting *Int'l Shoe*, 326 U.S. at 318;

---

[4] Defendants do not dispute that this Court has personal jurisdiction over NAPA VA, so this Court need not conduct a jurisdictional analysis with respect to NAPA VA.  *See* Dkt. 26 at 5 (referring to this Court's personal jurisdiction over NAPA VA as "not at issue").

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Therefore, just as general jurisdiction for individuals is generally limited to those states where the individual is domiciled, general jurisdiction over corporations is limited to "an equivalent place," such as the corporation's place of incorporation or principle place of business.  *Id.* at 136 (quoting *Goodyear*, 564 U.S. at 919).

Meanwhile, specific jurisdiction permits a court to exercise personal jurisdiction over a non-resident defendant where the litigation arises out of or relates to the nonresident defendant's contacts with the forum.  *Heathmount A.E. Corp. v. Technodome.com*, 106 F. Supp. 2d 860, 865 (E.D. Va. 2000).  To satisfy due process in the exercise of specific jurisdiction, a court must find "that the defendant purposefully directed his activities at residents of the forum thereby availing himself of the privilege of conducting activities therein and invoking the benefits and protections of the forum's laws."  *Id.* (citing *Burger King Corp.*, 471 U.S. at 472).  "As a corollary to this 'purposeful availment' requirement, courts" also "consider whether the . . . nonresident defendant could reasonably have" foreseen "being haled into court in the forum state."  *Id.* (citing *Burger King Corp.*, 471 U.S. at 474).

### 1. General Jurisdiction for NAPA LLP

Plaintiff has not demonstrated that this Court can exercise general personal jurisdiction over NAPA LLP.  It is undisputed that NAPA LLP is incorporated in New York with a principle place of business in New York.  Dkt. Nos. 22 at 6; 19 ¶ 10.  Plaintiff has not argued that NAPA LLP is "essentially at home" in Virginia.  Thus, this Court's exercise of general jurisdiction would not be appropriate.  *Daimler,* 571 U.S. at 136.

### 2. Specific Jurisdiction for NAPA LLP

The  Court  finds  that  Plaintiff  has  made  a  *prima  facie*  showing  for  specific  personal

jurisdiction over NAPA LLP.  Because Virginia's long-arm statute extends its authorization of personal jurisdiction to the limits of due process, this Court focuses solely on the constitutional inquiry.  *See English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990) (interpreting Virginia's long-arm statute as being coextensive with the Due Process Clause).

Plaintiff argues that this Court has specific personal jurisdiction over Defendant NAPA LLP, because Plaintiff's claims arise from his employment relationship with NAPA LLP and the alleged discriminatory actions taken by NAPA LLP employees in Virginia.  Specifically, Plaintiff argues that NAPA LLP and NAPA VA "employed Plaintiff and made the decisions to discriminate against him and create a hostile work environment." Dkt. 19 ¶ 12.  Conversely, Defendants argue that NAPA LLP does not have sufficient minimum contacts with Virginia.  Dkt. 22 at 8.  In the affidavit submitted by Defendants, Dkt. 23, Dr. Penzi, a member of the executive committee of NAPA LLP, states that NAPA LLP is an out-of-state defendant with no presence or employees in Virginia, that it transacts no business in Virginia, that it has no offices in Virginia, and that it has no other contacts to Virginia.  Dkt. 23  ¶¶ 3, 4, 11, 12.  Defendants also contend that exercising specific jurisdiction over them would not comport with the Due Process Clause of the Fourteenth Amendment because they have not purposefully availed themselves of the privilege of conducting activities within Virginia.  Dkt. 22 at 8.

Within the Fourth Circuit, courts apply a three-pronged test to evaluate whether specific personal jurisdiction is proper: (1) "did the defendants 'purposefully avail' themselves of the privileges of conducting activities in the forum"; (2) "does the claim arise out of these activities"; and (3) "is the exercise of jurisdiction reasonable?"  *Aitken v. Comms. Workers of Am.*, 496 F. Supp. 2d 653, 659 (E.D. Va. 2007) (citing *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001)); *Verizon Online Servs., Inc. v. Ralsky*, 203

F. Supp. 2d 601, 611 (E.D. Va. 2002).

i. Purposeful Availment of the Laws of Virginia

To exercise jurisdiction consistent with due process, a defendant must have established minimum contacts with the forum state itself. *Burger King*, 471 U.S. at 275. "The purposeful availment requirement is satisfied when the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection to the forum State." *Ralsky*, 203 F.Supp.2d at 612. Physical presence in the forum state is not required and the key inquiry is whether the defendant "directed his activities at Virginia 'in more than a random, fortuitous, or attenuated way." *Rosario v. Wands*, No. 1:09-CV-663 AJT/TCB, 2009 WL 2986614, at *4 (E.D. Va. Sept. 17, 2009) (quoting *Allen v. James*, 381 F.Supp.2d 495, 497 (E.D.Va. 2005). In conducting this analysis, the Court must focus on "the quality and nature" of the defendant's contacts with the forum state. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003).

In the instant case, the Court finds sufficient jurisdictional facts, when construed in the light most favorable to the Plaintiff, that NAPA LLP has intentionally directed its activities at Virginia. Though NAPA LLP claims in a Declaration that it has no contacts with Virginia, Plaintiff submitted exhibits,[5] which purport to show that (1) NAPA LLP provides medical services in the

---

[5] Plaintiff attached the following to his Opposition to the Motion to Dismiss: (1) his EEOC Charge and Agreement to Mediate containing signatures allegedly belonging to NAPA LLP employees, Dkt. 25-1 at 2-8, (2) email correspondence between Plaintiff and an alleged NAPA LLP employee transmitting his Warning Letter, Dkt. 25-1 at 9, and (3) his Warning Letter, Dkt. 25-2. As the attachments are relevant to Plaintiff's claims, the Court may "weigh them to assist in determining the jurisdictional facts." *In re Polyester Staple Antitrust Litig.*, 2008 WL 906331, at *7 (W.D.N.C. Apr. 1, 2008) (quoting *Reese Bros. v. U.S. Postal Serv.*, 477 F. Supp. 2d 31, 36-37 (D.D.C. 2007))).

Commonwealth of Virginia, (2) NAPA LLP was involved in his employment relationship,[6] and (3) NAPA LLP human resources employees participated in his allegations of harassment, discrimination, and retaliation and were present at the EEOC mediation.  Dkt. Nos. 19 ¶¶ 10, 12, 50; 25 at 13-15.  Beginning with Plaintiff's first jurisdictional argument, purposeful availment may be satisfied where medical professionals provide medical services in Virginia.  *See Nussbaum v. CVS Caremark Corp.*, No. 1:10-CV-1198 AJT IDD, 2011 WL 201482, at *5 (E.D. Va. Jan. 21, 2011) (finding personal jurisdiction where a medical provider telephoned a prescription to a Virginia pharmacy for a Virginia resident).  Thus, Plaintiff has established purposeful availment where he has presented some evidence that NAPA LLP performs medical services in Virginia.

Plaintiff also submits additional evidence in support of his second and third jurisdictional arguments that NAPA LLP has minimum contacts with Virginia.  Though NAPA LLP claims to have never employed any employees listed in the Amended Complaint, according to Plaintiff and emails that he presents, Heather Kartchner signed Plaintiff's written warning letter and her signature block says, "Virginia Region [next line] North American Partners in Anesthesia."  Dkt.

---

[6] Though Plaintiff argues this Court has jurisdiction over NAPA LLP because it is a joint employer with NAPA VA, many courts have held that joint employment is a theory of liability rather than a theory for asserting jurisdiction.  *See, e.g.*, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984) ("But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary."); *EEOC v. Bass Pro Outdoor World*, LLC, 884 F.Supp.2d 499, 525-26 (S.D. Tex. 2012) ("The integrated enterprise theory ... is a liability standard ... not a jurisdictional standard."); *Campanelli v. Image First Uniform Rental Service, Inc.*, 2016 WL 4729173, at * 7 (N.D. Ca. 2016) ("Even if [defendant] were liable under a 'joint employer' theory, this does not establish that a separate, non-resident corporate entity without minimum contacts can be hailed into a California court."); *EEOC v. AMX Communications, Ltd.*, 2011 WL 3555831, at * 7 (D. Md. 2011) ("[A]pplication of the integrated enterprise test for jurisdictional purposes would violate due process.  The Court will not apply the test to assert personal jurisdiction over the Defendants. . . .").  The Court therefore does not consider Plaintiff's joint employer theory as sufficient to support personal jurisdiction over NAPA LLP and instead focuses on the other specific allegations to determine personal jurisdiction.

25-2.   The address on the letterhead of the warning letter is also NAPA, LLP's New York

headquarters.  Dkt. 25-2.  Additionally, Plaintiff asserts in his Opposition that NAPA LLP human

resources employees participated in the EEOC mediation.  Dkt. 25-1 at 2 (EEOC Charge naming

North American Partners in Anesthesia and listing its New York headquarters address), 3 (EEOC

Agreement to Mediate showing Sheryl Blumberg's signature on the line above "North American

Partners in An[es]thesia").  Based on these facts, the Court is skeptical that NAPA LLP has no

relationship with the forum state and, in any case, at this stage, the Court must resolve all factual

disputes in favor of the Plaintiff.  *Krausz Indus. Ltd. v. Smith-Blair, Inc.*, 188 F. Supp. 3d 545, 551

(E.D.N.C. 2016) (quoting *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012)).  Thus,

the Court finds that Plaintiff has made a *prima facie* showing that NAPA LLP "avail[ed] [it]self of

the privilege of conducting activities within the forum State" by: (i) providing medical services in

the state of Virginia; (ii), engaging in employment activities with Plaintiff in the forum state, as

evidenced by the warning letter; and (iii) participating in the mediation, through the presence of

NAPA LLP employees.  *Goodyear*, 564 U.S. at 924.

ii. Cause of Action's Relationship to Defendants' Activities in Virginia

Next, the Court turns to whether Defendants' minimum contacts with the forum arise out

of contacts that "[D]efendant [it]self' create[d] with the forum."  *Walden*, 571 U.S. at 284 (quoting

*Burger King*, 471 U.S. at 475).  If Defendant's minimum contacts "are related to the operative

facts of the controversy, then an action will be deemed to have arisen from those contacts."  *Ralsky*,

203 F. Supp. 2d at 620 (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996)).

As Plaintiff's claim stems from the actions taken during his employment with NAPA LLP

including the investigation and warning letter that was signed by an employee who allegedly works

at NAPA LLP, it is clear that there is an affiliation between the forum state and the underlying

controversy.  *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582

U.S. 255, 262 (2017).

iii. Reasonableness of Exercising Personal Jurisdiction Over Defendant NAPA LLP

Because Plaintiff has satisfied the minimum contacts analysis with regard to NAPA LLP,

the burden shifts to NAPA LLP to demonstrate that exercising personal jurisdiction would

nonetheless "offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S.

at 316.  In ascertaining whether the exercise of personal jurisdiction over an out-of-state defendant

is constitutionally reasonable, courts within the Fourth Circuit consider five factors: "the burden

on the defendant, the forum [s]tate's interest in adjudicating the dispute, the plaintiff's interest in

obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the

most efficient resolution of controversies, and the shared interest of several [s]tates in furthering

fundamental substantive social policies." *Christian Sci. Bd. of Dirs. of the First Church of Christ

v. Nolan,* 259 F.3d 209, 217 (4th Cir.2001) (quoting *Burger King*, 471 U.S. at 477).  Ultimately,

the reasonableness inquiry focuses on whether exercising jurisdiction over a defendant "make[s]

litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage'

in comparison to his opponent." *Id.* (internal citation omitted).  NAPA LLP does not argue that

jurisdiction in this case is otherwise unreasonable.  Accordingly, this Court finds that the exercise

of personal jurisdiction over NAPA LLP is proper under the Due Process Clause at this stage.

B. Naming of the Parties

Defendants NAPA LLP and NAPA VA also argue that the Amended Complaint should be

dismissed against NAPA LLP because Plaintiff failed to exhaust administrative remedies.  Dkt. 22

at 9.  Specifically, Defendants contend that NAPA LLP was not named in Plaintiff's EEOC

Complaint and "was therefore never put on notice of any claims against it or even given the

opportunity to participate in the proceedings." *Id.* (citing *Cooper v. Virginia Beach Fire Dept.,*

199 F. Supp. 2d 451, 454 (E.D. Va, 2002).  Plaintiff however claims that "NAPA, LLP Human Resources employees participated in the mediation of the EEOC complaint."  Dkt. 25 at 14.

Failure to name a party in an EEOC charge may constitute a failure to exhaust administrative remedies and traditionally has been understood to be a potential subject-matter jurisdiction defect as to any Title VII claim brought against the unnamed party.  *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 458 (4th Cir. 1988).  Although neither party has acknowledged it here, the Supreme Court has held that the naming requirement is no longer jurisdictional.  *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1850–51 (2019); *see also Abadi v. Mecklenburg Cty. Govt.*, No. 3:17-cv-00435-FDW-DCK, 2019 WL 2546732, at *3 (W.D.N.C. June 20, 2019) (noting that Title VII's requirement that a plaintiff must exhaust all administrative remedies is no longer a jurisdictional issue under *Davis*, but that the substance of the requirement itself remains unchanged).  Accordingly, Defendants' argument will be analyzed under the Rule 12(b)(6) standard.  *See Oswaldo Argueta v. Fred Smith Co.*, No. 5:19-cv-84-FL, 2019 WL 6337426, at *3 (E.D.N.C. Nov. 26, 2019) (finding that *Davis* requires that the charge-filing requirement be analyzed under Rule 12(b)(6)).

The naming requirement for Title VII is dual purpose: (1) to notify the charged party of an alleged violation and (2) to secure the charged party's compliance with the law.  *Alvarado*, 848 F.2d at 458-59.  "If these two purposes are satisfied, the naming requirement has also been satisfied."  *EEOC v. 1618 Concepts, Inc.*, 432 F. Supp. 3d 595, 603 (M.D.N.C. 2020) (citing *Causey v. Balog*, 162 F.3d 795, 800-01 (4th Cir. 1998).  Courts are generally sympathetic "to the difficulties of mastering the organizational structure of an employer and naming all corporate entities that may have been involved in the discriminatory conduct."  *Keener v. Universal Companies, Inc.*, 128 F. Supp. 3d 902, 915 (M.D.N.C. 2015) (citing *Alvarado*, 848 F.2d at 460).

Thus, "[t]he failure to name a defendant in the charge does not bar a subsequent suit if these purposes are 'substantially met.'" *Clay v. Consol Pennsylvania Coal Co.*, 955 F. Supp. 2d 588, 601 (N.D. W. Va. 2013) (quoting *Vanguard Justice Soc., Inc. v. Hughes*, 471 F. Supp. 670, 687 (D. Md. 1979)).

The Court finds that Plaintiff's allegations satisfy the purposes of the naming requirement. Although Defendants contend NAPA LLP was not named in the EEOC Charge and was therefore not put on notice of the claims against it, there are conflicting facts in the record on this question. In response to NAPA LLP's Motion, Plaintiff sets forth the following facts related to this issue. First, in Plaintiff's EEOC Charge,[7] he named "North American Partners in Anesthesia" as his employer located at the address "68 S. Service Road, Suite 350" in Melville, New York, which neither party disputes is the location for NAPA LLP's headquarters. Dkt. Nos. 25-1 at 2; 22 at 8. Second, Plaintiff alleges Sheryl Blumberg is an employee of NAPA LLP who signed the mediation agreement and participated in the mediation. Dkt. Nos. 25 at 14; 25-1 at 3. Defendants counter that NAPA LLP never employed Sheryl Blumberg. Dkt. 23 ¶ 16. In support of Plaintiff's allegations, Plaintiff attached the email exchange where Sheryl Blumberg transmitted Plaintiff's warning letter where her signature block shows that she is the "Vice President of Human Resources Service Delivery" for "North American Partners in Anesthesia," and also contains the address for NAPA LLP's headquarters. Dkt. Nos. 19 ¶ 50; 25 at 14; 25-1 at 3-5.

---

[7] A court is permitted to consider pertinent documents attached to a defendant's motion to dismiss and plaintiff's response that are authentic and integral to the complaint. *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222-23 (4th Cir. 2009); *see also United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Blankenship v. Manchin*, 471 F.3d 523, 526 n. 1 (4th Cir. 2006); *Philips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Plaintiff's EEOC charge is integral to the Amended Complaint and relied on by both parties, so the Court may consider it here.

Given the conflicting information, and the necessity of resolving factual disputes in Plaintiff's favor, the Court finds that NAPA LLP at least had notice of the EEOC charge and plausibly participated in the mediation efforts. *See EEOC v. Newtown Inn Assocs.*, 647 F. Supp. 957, 960 (E.D. Va. 1986) (finding that when defendants "had actual notice and participated in the conciliation process," the naming requirement had been satisfied); *Bostic v. Wall*, 588 F. Supp. 994, 997 (W.D.N.C. 1984) (noting that "the courts are reluctant to dismiss the unnamed party if he had notice of the EEOC conciliatory efforts and participated in EEOC proceedings"), *aff'd*, 762 F.2d 997 (4th Cir. 1985).

Examining all the relevant factors, the Court finds that the dual purposes of the naming requirement have been satisfied at this time. Accordingly, the Court declines to dismiss the Title VII claims on this ground.

### C. Motion to Dismiss for Failure to State a Claim

#### 1. Joint Employer

Under Title VII, a party is liable for discrimination "only if it is an 'employer' of the complainant." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). At the outset, the Court notes that which entity—NAPA LLP, NAPA VA, or some other entity—was Plaintiff's employer is disputed. In assessing whether two or more entities jointly employed an individual for Title VII liability, courts consider whether "both entities exercise significant control over the same employees." *Butler*, 793 F.3d at 408 (holding a manufacturer was a plaintiff's joint employer as a matter of law even though he was technically employed by a staffing company). Courts consider several factors when making this determination, including authority to hire/fire, day-to-day supervision of the employee, employee discipline, and whether the employer furnishes the equipment/place of work, among others. *See Smith v. CSRA*, 12 F.4th 396, 414 (4th Cir. 2021)

(enumerating nine non-dispositive factors the court must consider but indicating those related to control are the most important).

Though Defendants assert that neither NAPA LLP or NAPA VA employed Plaintiff in any joint or single capacity, as noted *infra,* there are conflicting facts in the pleadings.  Plaintiff alleges the following facts related to the issue of joint employment by NAPA LLP and NAPA VA:

- Plaintiff was "employed with NAPA LLP and NAPA (Virginia) for nearly three years."  Dkt. 19 ¶ 18.

- Plaintiff was hired by MEDNAX, Inc. in 2018 and that "NAPA LLP acquired MEDNAX INC" in May 2020.  *Id.* at 4 n.2

- "NAPA, LLP exercised control over NAPA (Virginia) with regard to management, hiring, firing, pay and supervision of employees" and  they "shared human resource policies and procedures."  *Id.* ¶ 12.

- Plaintiff worked in Virginia, but "dealt with regional and national HR representatives and a New York-based-in house counsel for NAPA, LLP during the incidents in question."  Dkt. 25 at 14.

- Heather Kartchner signed Plaintiff's written warning and "her signature block says, "Virginia Region [next line] North American Partners in Anesthesia" and the address on the letter is NAPA LLP's New York Headquarters.  *Id.*

Construing these facts in the light most favorable to Plaintiff, NAPA LLP and NAPA VA appear to have had control over the hiring and firing of Plaintiff and seem to have been involved with employee supervision and discipline, as indicated by NAPA LLP's name and address appearing throughout employment-related communications with Plaintiff and additional references to the "Virginia region."  Thus, Plaintiff has plausibly alleged sufficient facts to support that he was jointly employed by NAPA LLP and NAPA VA.  Accordingly, this Court declines to dismiss the Amended Complaint on this ground.

### 2. Sex and National Origin Discrimination

In his Amended Complaint, Plaintiff alleges that Defendants discriminated against him

based on sex and national origin in violation of Title VII and the VHRA (Counts I, II, IV and V).[8] Dkt. 19 at 1.  Defendants argue that Plaintiff's claims of sex and national origin discrimination in Counts I, II, IV and V should be dismissed because Plaintiff failed to allege a *prima facie* case as he did not allege that he performed his job satisfactorily, that he suffered an adverse employment action, or that there was a connection between any adverse treatment and his protected classes. Dkt. 22 at 13-15.  Plaintiff asserts that the Court should deny Defendants' Motion to Dismiss because he does not have to plead a *prima facie* case and, in any event, he plausibly alleged sufficient facts to demonstrate that he suffered an adverse employment action and that he was harassed based on his sex and national origin.  *See generally id.* at 15-23.

To allege a claim for sex based or national origin based discrimination, a plaintiff must plead "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment decision; and (4) the occurrence of an adverse employment action under circumstances that give rise to an inference of unlawful discrimination."  *Green-Wright v. Capital One Services*, LLC, No. 3:21-cv-237, 2021 WL 4227057, at *2 (E.D. Va. Sept. 16, 2021) (citing *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 Fed. Appx. 466, 468 (4th Cir. 2015)).  Plaintiff does not contest that he failed to plead any facts that he was satisfactorily performing his job, and the complaint Ms. Shaw filed against him may indicate that he was not. Although Plaintiff is correct that he is not required to plead a *prima facie* case, *Swierkiewicz v.*

---

[8] The VHRA and Title VII employ substantially identical language prohibiting employment discrimination based on race, color, sex, or national origin.  Plaintiff's VHRA claims rest on the same facts as his Title VII claims and Plaintiff provides no alternative framework by which to analyze his VHRA claims.  Accordingly, the Court will analyze Plaintiff's Title VII claims and VHRA claims under the same framework.  *See Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, No. 3:22-CV-00041, 2023 WL 4032875, at *8 (W.D. Va. June 15, 2023) (analyzing plaintiff's Title VII and VHRA claims together).

*Sorema N.A.*, 534 U.S. 506, 508 (2002), Plaintiff also has not pled *adequate facts* to create a plausible inference that he suffered from sex or national origin discrimination – particularly where Plaintiff resigned from his CRNA position.[9]  Therefore, this Court finds Plaintiff has not pleaded a plausible claim of sex or national origin discrimination.

### 3. Hostile Work Environment

In addition to Plaintiff's claims of discrimination, Plaintiff also alleges that Defendants created a hostile work environment based on his sex and national origin.  Plaintiff asserts that the following facts support his claim of a hostile work environment based on sex and national origin: (1) Ms. Shaw, his white female coworker, harassed him, (2) management officials who investigated Ms. Shaw's claim showed him "bias" and "openly attempted to influence the result of the investigation," (3) Ms. Shaw's claims were thoroughly investigated, despite the lack of evidence, while Plaintiff's complaints against Ms. Shaw were not, (4) Ms. Shaw sexually harassed him because he was male, and (5) Ms. Shaw "would not have made claims of sexual harassment against [Plaintiff] if he were female." Dkt. 25 at 17-18.  Ultimately, Plaintiff claims that the "false claims of sexual harassment themselves constitute harassment against him based on sex." *Id.* at 18.

Defendants assert that Plaintiff failed to sufficiently plead a *prima facie* claim for hostile work environment.  Specifically, Defendants argue that Plaintiff has not pleaded conduct that is severe or pervasive enough to support a hostile work environment claim based on sex or national origin discrimination.  Defendants further argue that Plaintiff failed to plead that any unwelcome

---

[9] Taking *Swierkiewicz* into account, the Fourth Circuit has held that a plaintiff's factual allegations still must "be sufficient to satisfy the elements of a cause of action created by Title VII, and raise the plaintiff's right to relief above the speculative level." *Tutt v. Wormuth*, No. 19-02480, 2021 WL 4076729, at *1 (4th Cir. 2021) (per curiam) (internal quotations and citations omitted).

conduct was based on Plaintiff's sex or national origin.  Dkt. 22 at 15-16.  In support of their argument, Defendants contend that Plaintiff does not allege that he was targeted because of his sex or national origin and that Plaintiff acknowledged in his Complaint that the aggressive investigation was based on complaints about his inappropriate conduct.  *Id.* at 16.  Further, Defendants argue that holding that a company's efforts to investigate sexual harassment constitute sexual harassment, in itself, would make a mockery of Title VII.  Dkt. 26 at 11.

"To proceed on a Title VII hostile work environment claim, a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of [his] sex [or national origin], (3) was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment, and (4) was imputable to [his] employer."  *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011) (quotations omitted); *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir.2003).  "[O]nly harassment that occurs because of the victim's [protected class] is actionable."  *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997).

The Court begins by clarifying which factual allegations are relevant to Plaintiff's hostile work environment claims.  First, the Court agrees with Defendants that holding that false allegations of sexual harassment and an alleged aggressive investigation into those allegations constitutes harassment would make a mockery of Title VII.  The Plaintiff in *Miller v. Gruenberg*, No. 1:16-CV-856, 2017 WL 1227935, at *13 (E.D. Va. Mar. 31, 2017), *aff'd as modified*, 699 F. App'x 204 (4th Cir. 2017), brought forth a similar hostile work environment claim.  In *Miller*, the plaintiff alleged that his employer created a hostile work environment when it conducted a sexual harassment investigation based on reports that the plaintiff had sexually harassed other employees.  *Id.* at *6.  The plaintiff in *Miller* also alleged that the defendant ignored his workplace complaints while investigating those levied against him in support of his hostile environment claims.  *Id.*  The

24

court opined that the plaintiff's charge was "a perversion of the hostile work environment standard" and went on to explain:

> The fact that Defendant thoroughly investigated those claims and brought them to Plaintiff's attention, while protecting the identities of the accusers, does not afford Plaintiff a claim for a hostile work environment.  To find otherwise would hamstring an employer's ability to investigate harassment claims in the workplace in a fashion which balances the interests of due process and protecting victims.

*Id.*  Other courts in this Circuit and beyond have held similarly when faced with comparable allegations.  *See Akhavi v. Thomas Nelson Cmty. Coll.,* No. 4:21CV17, 2021 WL 6617312, at *4 (E.D. Va. Dec. 16, 2021), *aff'd,* No. 22-1061, 2022 WL 9904218 (4th Cir. Oct. 17, 2022) (holding a plaintiff cannot assert a hostile work environment claim based on allegations that other employees made workplace complaints against him and that his employer investigated those complaints); *McDonnell v. Cisneros* 84 F.3d 256, 261 (7th Cir. 1996) (holding an investigation of sexual harassment that exceeds the proper limits is not a form of actionable sexual harassment in itself); *Flanagan v. Reno*, 8 F. Supp. 2d 1049, 1051-52 (N.D. Ill. 1998) (granting motion to dismiss discrimination claims predicated on treatment plaintiffs received during investigations of sexual harassment complaints against them).  Plaintiff's allegation in the instant case is not materially distinguishable from those cited above, and Plaintiff cites no case law holding allegations of sexual harassment can themselves constitute sexual harassment.[10]  Thus, the Court finds that Plaintiff's allegations regarding the allegedly false accusations against him and the investigation into those accusations do not support a valid claim for a hostile work environment.

---

[10] In fact, some courts have held such assertions are speculative and meritless in the hostile work environment context.  *See e.g., Watts v. Lyon Cnty. Ambulance Serv.*, 597 F. App'x 858, 860 (6th Cir. 2015) (holding the allegation that a male employee would not have been subjected to false accusations but for the fact that he is male to be speculative and meritless.)

The Court must now determine if the remaining factual allegations support a hostile work environment claim.  The Court agrees with Defendants that the actions alleged by Plaintiff, while arguably troubling, are not sufficiently severe or pervasive to state a plausible hostile work environment claim.   In considering whether a complaint has stated a plausible hostile work environment claim, courts consider the "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Okoli v. City of Balt.,* 648 F.3d 216, 222 (4th Cir. 2011).  Importantly, the Fourth Circuit has made clear that "Title VII does not create a general civility code in the workplace" and "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (internal citations and quotation marks omitted).

Plaintiff's remaining allegations also fail.  Given that Ms. Shaw's allegations and the Defendants' investigation cannot constitute sexual harassment to support a hostile work environment claim, Plaintiff's hostile work environment claim is properly based only on (1) Ms. Shaw's outburst, (2) Ms. Shaw's alleged attempt to make others bad-mouth Plaintiff, (3) Ms. Shaw's smug attitude (4) the Defendants' failure to investigate Plaintiff's complaints and (5) Plaintiff's warning letter.  Courts have declined to find a hostile work environment based on workplace conduct far more severe and pervasive than what is alleged here.  *See, e.g.*, *Buchhagen v. ICF Int'l, Inc.*, 545 Fed. Appx. 217, 219 (4th Cir. 2013) (stating that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments"

to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)).  Further, courts in this Circuit have routinely held that ignoring complaints of hostility between coworkers is also not severe enough to support a hostile work environment claim.  *High v. Wells Fargo Bank*, No. 3:21CV81, 2023 WL 2505540, at *9 (E.D. Va. Mar. 14, 2023) (holding disregard for claims of hostility cannot support a hostile work environment claim); *Campbell v. Sch. Dist. of Chester Cnty.*, Case No. 0:09–411–CMC–PJG, 2010 WL 5600905, at *7 (D.S.C. Dec. 20, 2010) (finding that the plaintiff had "failed to establish a prima facie case of a hostile work environment" when the conduct "she characterize[d] as harassment include[d] the defendant's ignoring her complaints" and stating that "[t]his conduct simply [did] not rise to the level required by law to establish a hostile work environment."). Plaintiff's allegations essentially detail rude treatment from a colleague, personality conflicts, and disagreements with management, which are neither pervasive nor severe enough to be actionable.

Even if the Court were to find the alleged conduct pervasive and severe, Plaintiff has not adequately pleaded that the alleged unwelcome acts were based on his sex or national origin.  The Fourth Circuit has held that for conduct to be based on sex or national origin, a plaintiff must allege that he would not have been subject to harassment but for his sex or national origin.  *Webster v. Chesterfield County School Board* 38 F.4[th] 404, 413 (4th Cir. 2022) (based on sex); *Innocenti v. WakeMed*, No. 5:18-CV-90-FL, 2019 WL 3683606, at *6 (E.D.N.C. Aug. 6, 2019) (based on national origin).  Plaintiff alleges Ms. Shaw called him a "fucking harasser," a "fucking bully" and said she never wanted to see him again.  Dkt. 19 ¶ 24.  Plaintiff also asserts in his Complaint that he teased Ms. Shaw in the day or so preceding her outburst.  *Id.* ¶¶ 23-24.  Plaintiff alleges no

facts that show Ms. Shaw's comments were based on his sex or national origin; rather, Plaintiff specifically alleges that those remarks were made in response to his "brown nose" joke[11] earlier in the week.  Therefore, Plaintiff has failed to plead that factual allegations related to Ms. Shaw's behavior toward Plaintiff occurred because of his sex or national origin.

Plaintiff's allegation that his employer's failure to investigate his claims and the issuance of the final warning letter was based on his sex or national origin likewise fails.  Although Plaintiff does highlight that Ms. Shaw's complaint was aggressively investigated while his was not, there is nothing in the Amended Complaint that suggests this decision was based on his sex or national origin.  Plaintiff argues that allegations regarding Ms. Shaw's HIPPA violations were eventually substantiated, but his complaint was still not investigated.  *Id.* ¶ 42.  However, even taking that as true, the Court would be required to speculate that the reason his complaint regarding harassment was not investigated was because of sex and/or national origin and not because of other deficiencies with his complaint.  Finally, Plaintiff does not allege that the warning letter was issued based on his sex or national origin and not due to the findings of the investigation.  Accordingly, Plaintiff fails to state a plausible claim of hostile work environment based on either sex or national origin under Title VII or the VHRA.

4. Retaliation

Plaintiff also alleges that Defendants retaliated against him for reporting the alleged hostile work environment and sexual harassment that he endured (Count III), but that claim also fails.  *Id.* ¶¶ 78-87.  To assess Plaintiff's retaliation claim under Title VII, Plaintiff must first make a *prima facie* case of retaliation by demonstrating that  "(1) []he engaged in a protected activity; (2) the

---

[11] The reference to "brown nose" has nothing to do with race or national origin but rather in common parlance is defined as an individual who acts "in a grossly obsequious way." Oxford Languages (2023).

employer acted adversely against h[im]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)).

Defendants do not appear to contest that Plaintiff engaged in a protected activity by filing a complaint against Ms. Shaw for harassment, albeit through Ms. Englade.  Rather, Defendants argue that Plaintiff's *prima facie* case fails because Plaintiff does not allege that his employer took adverse action against him and fails to "to allege a causal link, whether direct or indirect, between any protected activity by Plaintiff and any unidentified adverse employment action."  Dkt. 22 at 17.  In support of their argument, Defendants assert that Plaintiff voluntarily resigned and that he was never terminated by Defendants.  *Id.* at 13.  Plaintiff, in contrast, contends that he sufficiently alleged an adverse action by pleading constructive discharge.  Dkt. 25 at 17.

To establish constructive discharge, an employee must meet a high standard.  *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995).  He must show working conditions "so intolerable that a reasonable person in [his] position would have felt compelled to resign," and that "plaintiff actually resigned because of those conditions."  *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019).  "[I]ntolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign."  *Id* at 212.  "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

In support of his claims for constructive discharge, Plaintiff relies on the following allegations: (1) Ms. Shaw harassed Plaintiff, (2) Plaintiff reported Ms. Shaw's harassment, (3) Defendants failed to investigate Plaintiff's claims, and (4) shortly after Plaintiff reported Ms.

Shaw, Defendants issued a first and final warning without cause in retaliation for his report.  Dkt. 19 ¶¶ 80-85.  Critically, the Fourth Circuit has found more extreme behavior to be insufficient to establish the conditions necessary to plead constructive discharge.  *See Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (concluding that allegations of being yelled at, called a poor manager, being forced to work with an injured back, and being chastised in front of customers were insufficient to establish constructive discharge).  Although his employment situation may have been stressful and unpleasant, Plaintiff fails to plead allegations sufficient to make constructive discharge plausible.

Construing Plaintiff's claims generously, he also appears to claim that the warning itself was an adverse employment action.  However, Plaintiff does not allege that the warning altered the terms of his employment.  While discipline such as a warning might conceivably support an adverse employment action, the alleged facts here do not rise to actionable levels.  *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 429, 431 (4th Cir. 2015) (holding "written nor the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline"); *Jeffers v. Thompson*, 264 F.Supp.2d 314, 330 (D. Md. 2003) (holding a reprimand that remained in employee's record for two years worked no tangible harm and thus did not qualify as adverse employment action).  As Plaintiff has failed to allege an adverse action,[12] his retaliation claims will also be dismissed.

---

[12] Since the Court has concluded that Plaintiff has failed to plead an adverse employment action, the Court declines to analyze whether there was a causal connection between the alleged adverse action and the protected activity.

IV.   CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion to Dismiss (Dkt. 21) is GRANTED and the Amended Complaint (Dkt. 19) is DISMISSED WITH PREJUDICE.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record and to close this civil action.

It is SO ORDERED.

Alexandria, Virginia
September 12, 2023

/s/
Rossie D. Alston, Jr.
United States District Judge